May it please the court, Joan Jacobs Levy appearing on behalf of the appellant Paul Kent Cassell. And I would like to reserve four minutes for rebuttal, if I may. You may do so. And just as a matter of some housekeeping, before I begin this substantive argument, I just want to point out to the court that when I was reviewing my copy of the excerpts of records this weekend, I noticed that there was a tabbing error, and I don't know if your copies were similarly mis-tabbed, but tab 8 is supposed to contain excerpts of the reporter's transcript for the trial date of July 13, 2001. And in my copy, all but the first page were placed behind tab 9. Apparently just the first page was in tab 8, and then everything else was put behind tab 9, which was supposed to be the sentencing transcript. The sentencing transcript is there behind tab 9, but it's behind the trial transcript. So I just wanted to point that out to inform you that you do have the complete record. Now, Ms. Levy, we just were presented by our deputy clerk with something called United States v. Cassell, missing pages cited by the government. Is that your submission? I submitted it, but it was pages that the government had referred to in their brief that were the pages were not provided in a supplemental excerpt of records and were not provided in my excerpt of records. They are part of the trial transcripts. I was not – I didn't know whether the court – whether the three of you had copies of the complete transcript. So I wanted to point out that there were 128 cites to the record that were not provided to the court by the government, that the government cited in its brief. Your position is that this is properly excerpt of records, and whatever was filed had this but was in the wrong place? No, no. This is a separate issue. This was – the government in its brief cited to these pages in the record, but those pages were not provided to the court. I see. And so that's separate from the missed tabbing that I was pointing out to you. All right. That should be in there. Very good. Your Honors, this statute, 18 U.S.C. 1060, has been on the books for over 170 years and has never prior to this Court's findings been interpreted by an appellate court on the issues that are being presented here. And I think that factor alone substantiates the argument that the statute has some problems with it, in the sense that it's unable to be enforced without resorting to some arbitrary and capricious decisions by law enforcement. And the congressional intent behind the statute was to prevent fraud and conspiracy on the part of persons wishing to acquire government land back 150, 170 years ago, 100 years ago when the West was being developed and there was vast acreage of land and there were all kinds of conspirators who were attempting to buy up the land at low prices and resell it to other people at higher prices and to prevent other people from bidding on it. And just as a preliminary matter, I would maintain that in the case that we're addressing today, that fraudulent purpose is not at issue. This is not a case involving conspiracy. This is not a case involving vast tracts of land. It's a different factual predicate. In this case, Mr. Castle wasn't interested in making a lot of money by reselling the land. He was a land occupier whose girlfriend, whose significant other for 20 years, owned the property next to the lots that were for sale, and they wanted to buy it for themselves. We don't deny that. That was their goal. They wanted the privacy that the desert provides. And to that end, he would tell potential buyers his opinion about the area in order to dissuade them from finding the property to be desirable. And I would just posit to this Court that isn't this really the corollary in commercial speech of the puffery claims that marketers make, claiming their product is the best in the market. Is it puffery to say that if you buy it, I guarantee it's going to get burnt down? Well, that becomes the significant issue, I think, as to whether or not there was a true threat involved or whether there was just the self-serving talk of somebody who wanted to make sure that nobody else was going to buy that property, you know, that he can get the property. That's self-serving? I guarantee you that it would burn down. I believe he said the property would be burnt. I will see to that. That's puffery. Well, he said that, allegedly said that. It's uncorroborated, because he said that to Mr. Gooden. Mr. Gooden testified that Mr. Castle said that to him. The jury bought it, though. Pardon me? The jury bought it. Well, we don't know if the jury bought that specific statement or if they bought the whole scenario, because there was testimony from other people. I mean, clearly, clearly Mr. Castle was being obnoxious. He was loud. He was profane. He had his ugly dogs. He was talking about a lot of things. And I think that the rhetoric got hot. Now, we have to assume for purposes of argument that he did say that to Mr. Gooden, even though Mr. Gooden's wife did not testify to that. But I think the question becomes, just like the statements that were made in Claiborne v. NAACP, which was a case where there was a boycott against white-owned stores by blacks in the south, and they wanted this boycott to be complete, to be successful. And so the black leaders were then making statements to some of the black people who would not follow the boycott. We know who you are. We're going to break your neck. We're going to see to it, you know, that you won't be ‑‑ you're going to have problems in this community, and so on and so forth. And the court found that that rhetoric was emotionally charged and that it really didn't rise to the level of an immediate threat of imminent harm. And I think that that is a really key issue with Mr. Castle. Mr. Castle allegedly said, if you buy this property, if you build a house, it will burn. I will see to it. Now, that's speculative. That's out in the future. That's making several assumptions. That's over a period of time. The First Amendment, as it's been interpreted by the Supreme Court over and over again, really is more protective of the speaker than of the listener. The kinds of speech that are unprotected is speech that's likely to incite violence, fighting words, obscenity. We know that. So the question is, Mr. Castle's statement, if you buy the lot and build on it, it will burn. I will see to that. Where does that fit under those objective measures of unprotected speech? You're feeling he has a First Amendment right to say that? Yes. He has a First Amendment right to say that if you left anything there, it would be stolen, vandalized. I'll see to that. He would see to that. Unless the Court interprets his words as a true threat of him following through within a reasonable period of time, I do believe that that speech is protected by the First Amendment, because he is trying to use his powers of persuasion, and he got angry. And I submit to the Court that perhaps it wasn't tactful, perhaps it wasn't diplomatic, but I believe the Court must examine whether or not he had the means to do it. The Dinwiddie factors in United States v. Dinwiddie really kind of lays it out for this type of thing, that the threat has to be examined in its factual context. Was the threat conditional? Was it based on future harm? Has he made past similar threats? And was there any reason to believe he had a propensity for violence, and then any other probative factors? And if we take those factors and analyze them in terms of Mr. Castle, you know, this was a highly emotionally charged environment. I think, you know, Mr. Gooden and Mr. Castle rubbed each other the wrong way, like oil and water. There was no similar threat that was made to Mr. or Mrs. Renard, and as I stated previously, there was no threat to Mrs. Gooden along those lines. Mr. Gooden? Oh, sorry. Go ahead. I'd just like to clear something up in my own mind. Is it your position that a threat to eliminate property is not a sufficiently violent threat to qualify as a threat which is not allowed by the First Amendment? Does the threat have to be to physical violence, or can it be to property violence? Oh, I believe the threat can also be to property. I think it's injury, sustainable injury, whether it's emotional, whether it's physical, whether it's property damage. Thank you for clearing that up. Counsel, you've been concentrating, I gather, pretty much on sufficiency of the evidence. I would like to hear what your view is on the injury instructions. I have some trouble with that, and I'd like your input on it. Okay. Specifically, is it required that there be a mens rea element in the jury instructions and specific reference to bodily harm? Well, I think it's always been the preference of the court that statutes have a mens rea. I think there's a disfavoring of strict liability or the general intent type statutes, and in looking at other statutes that contained an intimidation element, most of them really did provide a specific intent to intimidate. Otherwise, you can get into trouble for activities for which you're ---- But this statute doesn't require knowingly or intentionally. Why isn't it a strict liability statute? Because I think it's dangerous to make it a strict liability statute to assume intent just from the speech or the conduct. And while I know that the statute at issue in Virginia v. Black did have an intent element, I think that really makes it clear about the dangers of inferring it out of the action and that there should be an intent element provided. I think there's also something else wrong with the jury instruction that concerned me, and I think that the instruction itself was not complete and very confusing as worded. The instruction is given is intimidation is to make a person timid or fearful through the use of words and conduct that would put an ordinary reasonable person in fear or apprehension for the purpose of compelling or deterring legal conduct of that person. And I'm really concerned about the fact that it says compelling legal or ---- compelling or deterring legal conduct. The deterring legal conduct would be correct, but it really should be compelling illegal or unlawful conduct. I don't think it's intimidation to compel legal conduct. And I can give you an example of that, you know, maybe a little bit silly, but I think it works. You know, my husband was recently ill with the flu, and if I said to my husband, you know, if you don't take your antibiotics, you're going to get pneumonia and die, and I'm not going to take you to the emergency room, I am trying to intimidate him. I'm trying to make him fearful about his health condition, and I'm trying to compel him to do the lawful act of taking his medication. So I am compelling him to do a lawful act. I don't think that's a criminal act. I'm just a naggy wife. And I know that's maybe a little bit of a silly analogy, but I think it points out the problem with compelling legal conduct. More specifically, if I could just dovetail onto what Judge O'Scanlan asked you, the jury was not charged here that there has to be a knowing and intentional violation of this statute. Is that correct? That's correct. Was that objected to? Yes, it was. All right. So you have objected to error, you claim. Why, if it is error, why is it harmless error since no jury, I'm sure the appellee will argue, would have looked at this and convicted him if he didn't intend to burn down this place, threatened to burn it down with the dogs and all this other harm? Why is that not error, harmless error? Well, just to respond specifically to what you're saying, there were two counts. And even assuming that they can infer intent by the threat to Mr. Gooden, I think that was count two, whichever count that was, I think they can't use that to infer intent to intimidate Mr. Renard. Mr. Renard himself said he wasn't intimidated, but he just thought other people might be. Now, I think that by having that jury instruction, there's certainly the spillover effect from one count to the other. So that so I think there was a danger there. And, again, we don't know what part of the testimony the jury believed and if the jury really believed he was going to burn down a house if a house was ever built on a lot that was ever bought. The fact remains Mr. Gooden did buy a lot nearby and moved there and lived there and was living there at the time of trial and wasn't fearful of doing that. If there aren't any more questions, I'd like to reserve these four minutes for rebuttal. You may do so, counsel. We'll hear from the government. Good morning. John Conklin on behalf of the United States. And before I start my argument, I'd just like to respond to the last point the defense counsel made because I have a habit of forgetting some of these things. She stated that Mr. Gooden, in fact, did purchase a lot, but Mr. Gooden was very clear in his testimony that he purchased lot 105 because of the way it was situated and because of the fact that, in fact, he could build his house far enough away from the defendant so he wouldn't have to be exposed to him. Mr. Gooden clearly indicated they did not purchase 107 because of the defendant. So simply to state that, well, if you look at the facts, Mr. Gooden went ahead and purchased the lot anyways ignores Mr. Gooden's testimony. The defendant cites numerous attacks to the statute in this case constitutionally. The defendant alleges that the statute is, in fact, overbroad. The statute is, in fact, vague. And the statute, in fact, impinges on the defendant's First Amendment rights to express himself. The overbreadth argument and the vague arguments are simply without merit, as is the follow-up First Amendment argument. But the Supreme Court has previously made clear that for purposes of attacking a statute pertinent to the First Amendment, standing is unique. And within that standing, the party must, in fact, allege and establish that it would be the rights of third persons, not before the court, that are, in fact, infringed upon. That couldn't and did not happen here. The statute here is very clear. The statute here, as Defense Counsel states, has been on the books for, I believe, almost a century. It has been addressed previously, and the purpose behind the statute, as indicated in the Fackler v. Ford case, where Defense Counsel stated, was to protect the government interests in land-bidding processes. The defendant chooses to portray this as something that's somewhat historical in the fact that it would not really be enforced anymore, and the circumstances of this case establish that's not true. Mr. Cassell's posture at this time and his presentation of the case can be fairly equated, I would submit, to the Old West, as can this area. The rights of these individuals and the beliefs these individuals have in their property rights is stunning, and Mr. Cassell is an excellent example of that. There can be no question as to what Mr. Cassell's true intent was here. He did not want anybody to buy the land around his area, whether or not it was for a profit motive or whether or not it was for his own personal enjoyment doesn't matter. He did not want people to buy it, and, in fact, it cannot be disagreed with that the two victims in this case, the Goodins and the Renards, did not buy the property because of Mr. Cassell's actions. Mr. Cassell, when the Renards first approached him, ran up with a barking dog, dogs that were described as vicious, as snapping, and told them things about the property that they subsequently learned were untrue. The defense counsel raised it in her brief. She talked about the fact, well, the Renards went over and had dinner with them later on, but Mr. Renard made clear the reason he accepted the dinner invitation was, in fact, to sort of see what the defendant was talking about and whether or not his claims were true, and he learned they were false. So now we have the defendant not only running up to these people being very aggressive, yelling at them, asking them, pardon me, but I believe the quote was, what the hell are you doing on this property, and coming up with dogs that were described by the victims as vicious, but he is now saying things to them that are untrue. The statute is clear, and the statute reads that whoever, by intimidation and then combination or unfair management, hinders, prevents, or attempts to do the same, any person from bidding upon or purchasing any tract of land offered for sale. Counsel, do you agree or do you not agree that an essential element of the legal definition of intimidation is to cause a reasonable person hearing the words to find himself or herself in fear of immediate physical violence or property damage? I disagree. The defense relied on the Aslop case to try to support their request for jury instruction requiring that, and Aslop referred to 2113, the bank robbery statute, which is a crime of violence and which does require some type of force or intimidation in order to accomplish the taking from the institution. The intimidation necessary here is different, Your Honor, and I believe it was very – I think that both parties were allowed to litigate the jury instruction fully, and Judge O'Neill, after very thoughtful consideration, came up with a jury instruction that he believed satisfied both parties, and the jury instruction as defense counsel, as I believe read it, simply says intimidation is to make a person timid or fearful. But then what Judge O'Neill – What? Timid or fearful, and then the instruction continues, through the use of words and conduct that would put an ordinary person in fear or apprehension for the purpose of compelling. So it would be timid or fearful of compelling them or deterring them from engaging in legal conduct. In this case – Fearful of what? In this case, purchasing the property. In this case – But why – doesn't it have to be timid or fearful that something bad will happen to them if they purchase the property? And the question is, what is that something bad? Well, yes, in the sense of clearly the evidence established that. If this Court were to find that the statute does require that, the government's position would be the evidence satisfied it. Because the defendant says – Harmless error. Pardon me? Yes. Harmless error. Yes. If that's, in fact, what it required, because as the Court has already noted, the defendant said to the Goodins, your property will burn down. If you build it here, it will burn down. And then the quotes are, I will see to that. Nothing can be clearer. The defendant made it clear. Besides saying it would burn down, he said, all your property will be stolen. I will see to that. And, in fact, the Goodins stated that they didn't buy the property because – and both witnesses stated they didn't buy the property because they felt intimidated. Now, Mr. Bernard, who's a 40-year law enforcement agent, and this relates to Count 3, which is not challenged in this appeal, but Mr. Bernard stated that initially when the defendant contacted him back and said, were you really intimidated, he said, well, as a law enforcement officer personally, I didn't feel you were going to harm me. But other people, based upon what you said to me, would have been intimidated. And then – Was he an expert witness on that? No, he wasn't. And he wasn't presented as an expert witness. On the other hand, I think the instruction requires the jury to consider this from the perspective of an ordinary, reasonable person, and at that point I don't think Mr. Bernard was. He was now presenting himself as whether or not a law enforcement officer would have been intimidated by this conduct. Counsel, I'm very skeptical about harmless error in First Amendment criminal challenges, and I want to read to you a passage from Virginia v. Black. Intimidation in the constitutionally prescribable sense of the word is a type of true threat where a speaker directs a threat to a person or a group of persons with the intent of placing the victim in fear of bodily harm or death. Does the jury instruction in this case satisfy that requirement? Well, the jury instruction, to answer the Court's question, the jury instruction does not include the language in fear of bodily harm or death. So if the Court's question is does the jury instruction have that language in it, clearly it does not. Because as I've read the jury instruction, the jury instruction says intimidation means attempting to hinder or prevent any person from bidding upon or purchasing a tract of land. I'm sorry, that was the statute. Intimidation means to make a person timid or fearful through the use of words and conduct. The defendants, the appellant, offered instruction number one. Special jury instruction number one did include the last words, as would produce in the ordinary person fear of bodily harm. So that element, which was discussed by Judge Scanlon just a moment ago by quoting from Virginia v. Black, was in the jury instruction tendered by the defendant and rejected by the Court. I agree. The Court looked to numerous cases, and I believe one of the cases the Court looked to was Planned Parenthood, where the Court used the definition of intimidation involves putting in fear for the purpose of compelling or deterring conduct, and then also looked to Hicks. And defense counsel is correct, I must apologize. When I cited Hicks, I cited as a Ninth Circuit case. It's clearly a Fifth Circuit case as the site itself. What was charged here did not have the intent factor, the knowing intent factor. What Judge O'Scallion read to you did have intent, and it's absent from the charge that was delivered to the jury in this case. Absolutely, which is why the governance position is it's not necessary here. Why is it not necessary? They could have convicted him for being using negligently or carelessly using language and not intending to burn anything down or to do harm. He could have been convicted of a criminal offense for being careless or stupid. Well, I don't believe so, Your Honor. The instructions, the Court instructed on the elements and instructed that the defendant has to, by intimidation, hinder or prevent a person from building on land. That could have been through negligent or careless talk, not intending to intimidate people, but to just using talk which was not intending to do them bodily harm, but which they took to mean that they were going to get bodily or personal damage to their property. Your Honor, the Court considered that issue when the Court was considering the jury instructions, and the Court was most concerned with whether or not words alone would be sufficient, which is why the Court modified the instruction to put it in the conjunctive rather than the disjunctive and require words and conduct. I've never heard a jury instruction in a criminal case that didn't have intentionally or knowingly as part of the boilerplate charge. I've never heard one. Well, I believe, Your Honor, in general intent crimes, for instance, in a rape case, you don't have to prove that language would not be in there. It would simply be an individual engaged in an act of and then describing what the rape would be. But in a general intent crime, there's not an intent instruction. But you have to intend to do the acts described in those crimes. In this case, this is not a general intent type of statute. You're intending to intimidate persons. And I take it that you could intimidate someone by using careless talk without wanting to intimidate them. Well, I don't think the instruction would allow the jury to come to the conclusion that careless talk is sufficient to satisfy the statute. The instruction says it is the intimidation to make a person timid or fearful. It tells the jury that that words and conduct have to be to make the person feel timid or fearful. So while they feel intimidated or fearful because of idle, careless talk. Well, I disagree that idle, careless talk would satisfy both the elements of the statute and the jury instruction that the Court provided. The jury instruction says it is intimidation and then defines intimidation as to make a person feel timid or fearful and conduct that would put the ordinary person. So it does require that, in fact, those acts are those that make the person timid or fearful. That's talking about cause, not purpose, not intent. It's a different element, isn't it? Well, I don't – yes, it is, but this is not a specific intent crime. At least the words of the statute don't portray it as a specific intent crime. It's a general intent crime. Do you infer in order to make it constitutional, as we do in many cases, that Congress intended a mental element to be inferred from its language? And if so, what is that mental element? Would negligence do? Well, perhaps it would. There must be some mental element, but the question that was just phrased is whether or not it has to be specific intent. There was a reading of the statute that would say if you engage in this conduct and the conduct intimidates another person and by that intimidation prevents them or stops them from purchasing the land, that satisfies the statute. And perhaps the language of the statute is defense counsel even stated when she first started her argument was it's a very broad statute. And the purpose is to prevent people from doing exactly in this case what Mr. Cassell did through words and conduct, preventing other people from purchasing land. If we should decide, I'm not saying – well, of course, we have a conference, but if we should conclude that the element of intent was error, not including it, could we also conclude that the intent not having been charged in the – to the I would hope so. I know you're hoping, but I'm asking you what – But help us connect this up. I've got the same concern. And on the one hand, you can defend the statute against challenges of overbreath and vagueness by reading in an intent requirement. But then when it comes to charging time, it's okay not to mention intent. I have a hard time understanding the government's argument. Well, I apologize for being confusing. I wasn't intending to say for the purposes of First Amendment, the intent issue came into play. For First Amendment, it's both the overbreath argument and the vagueness argument. And the vagueness argument, which is what I think the Court is more concerned about here, is whether or not it would put a person on reasonable – a person of reasonable intelligence on notice that their conduct would be forbidden. And I apologize. I don't remember the name of the Supreme Court case that says that. And within that context of the First Amendment, whether or not the statute is vague, I think the statute passes the test. Well, without reading our minds, address the question that's presented. If we conclude – I'm saying we haven't concluded a thing about this case or any other case. If we were to conclude that it was error for the jury not to have been in charge knowingly or intentionally, something like that, could we also conclude that it's harmless error in this case given the facts of the case and, you know, the bad dogs and the place is going to burn down and it's haunted and all this other language? Could we conclude that? Well, there – yes. In the sense that there could be, from the government's perspective and looking at the evidence in the light most favorable of the government, there can be no other interpretation of the evidence except that that is exactly what Mr. Gooden decided to do. So the Court's question is yes. Even though the specific intent instruction, if required, was not given, it's harmless error because the evidence thoroughly established the specific intent. Well, if we decide that it should have been charged, you're dealing with a fundamental right of – a constitutional right, not to be convicted without intent, we have to conclude that beyond a reasonable doubt, wouldn't we? Yes. For the purposes of – for the purpose of whether or not beyond a reasonable doubt there was sufficient evidence to establish the specific intent necessary and there was. By Mr. Cassell's own words, if you build it, I will burn it down. Or pardon me. He didn't say I will burn it down. He said if you build on this property, I will see to it that it is burned down. So those words and conduct, again getting back to the language of the instruction, show exactly what his intent was. There can be – and I don't think defense counsel is making the argument that Mr. Cassell was just kidding here. I haven't heard any argument that in fact it's unreasonable to interpret what Mr. Cassell was doing here as not trying to prevent these people from buying the land. That's exactly what he's saying. Her argument, as I understand it, in her brief, is that he didn't intend to intimidate these people. He's just blowing off his mouth about the place he's wanted. He's got a mad dog there that's going to burn down and so forth. But he never intended to intimidate them. And so the jury never had the benefit of knowing whether he intended to put them in fear of property damage. Right. And it's – that's her argument. I would submit that that's not a reasonable argument given the clear state of the evidence. But – and that perhaps goes back to the statute. The statute doesn't require, for instance, that you're assaulting them or intimidating them that day that they're going to be harmed. It only requires intimidation to prevent them or hinder them from purchasing the land. So given that, I would agree with the court that if this court were to find that in fact the specific intent was necessary, then the evidence beyond any – beyond a specific intent would not be intended to do. Is there any – is there any evidence of threat to personal bodily injury? Pardon me. You mentioned the burn the house down. But apart from that? No. None that I'm aware of, Your Honor. I don't believe it at any time. Ms. Gooden states that when they were there and present on the property, her husband became very angry and therefore she sort of ushered the defendant aside so her husband could take a walk and he took a walk and came back. But I don't think there's ever anything in the record where the defendant threatened bodily harm. It could be fairly portrayed by threatening to burn down the house if somebody was in it, but he didn't say that. He just said threatened bodily – threatened to burn down the home. Is requirement of intent to commit a criminal act so fundamental as to be fundamental and not susceptible to harmless error analysis? I – to be candid with the Court, I'm not aware of any case that holds to the contrary or from the defense perspective that supports that proposition. If the Court would like supplemental briefing on that, I'd be happy to provide it. I'm – the question would simply be, as I interpret it, if the Court fails to instruct on a necessary element, can harmless error – Now, the question is, if we decide that intent was a necessary element of this crime, it was not charged and it was objected to, so we're not dealing with plain error. We're dealing with objected-to error. And is that error so fundamental as to not to be – not to be in the area of error which we can evaluate under a harmless error standard? There are many things such as that, such as a properly appaneled jury, an unbiased judge. These are so fundamental that you can't say the guy was so guilty, it's harmless error. These are fundamental. I'm asking you, is the requirement that you can't be convicted of a crime unless you intend to commit the crime so fundamental as these other examples that even if the defendant is guilty without any question, that there has to be intent? Is it so fundamental as not to be susceptible to be evaluated under the harmless error standard? I don't believe so, Your Honor. The Court's – and again, I'm obviously having a little – a slightly hard time dealing with the question, because the Court stated, is it fundamental that we have to prove intent? Is it so fundamental to prove intent, such as other requirements, even if the defendant is guilty without any question, that there has to be a retrial because the error is not allowed to be evaluated under a harmless error standard of review? I'm not aware of any law that holds you the way, Your Honor. I apologize. I don't know. The government's perspective would be no, because the evidence – it is not fundamental. The evidence was presented to the jury. The jury ruled beyond a reasonable doubt as to the defendant satisfying the statute, and in fact, the intimidation was present. To say whether or not – I mean, I want to be candid with the Court, and I don't want to say just because we want the government to prevail, but I would be concerned that if the intent was an element and the jury was not instructed on that, whether or not it would be fundamental error or not. Thank you, counsel. Your time has expired. We will hear from the appellant. Ms. Levy. Yes. I'd like to just correct one thing that opposing counsel stated. It was not Mr. Gooden who bought Lot 105. That was Mr. Renard. Lot 105 is immediately adjacent to all the land that was owned by Anastasia Kateranis, who was Mr. Castle's girlfriend. So the argument that Mr. Gooden bought this property so that he could build as far away from possible is incorrect. What Mr. Gooden ended up buying was he bought, not through the government auction, but he bought private land in the same area, and he bought that before the auction occurred. And I think it's very – I want to get back to this point that whatever it is that Mr. Castle said or didn't say, he did not hinder anybody from bidding on land at a public auction, which is what the statute forbids. Mr. Renard was present at the auction. Mr. Renard bid on two lots and purchased two lots, 105 and 103. And in fact, someone from the BLM, Mr. Gunn, testified that he even believed that Mr. Renard bid on Lot 107, which is the lot that's in issue, which was ultimately bought by Ms. Kateranis. I want to address overbreath. You know, in terms of the rights of persons who are not presently before the court, I think the statute does jeopardize those rights. What about somebody who's standing and leafleting in front of the BLM office when auctions are going on, who's holding placards, who's picketing or protesting the policies of the Bureau of Land Management? Their rights would, if they do that at a time that there's a government auction, they can be intimidating people who are coming to the auction, and therefore, I believe that the rights of third persons are at risk. In terms of the vagueness argument, really quick, in order for a statute to be vague, it means that the forbidden conduct is not readily ascertainable from the statute, and that the statute does not provide any minimal guidelines for law enforcement which would allow unfettered discretion on the part of law enforcement. And I would submit to the court that neither of these elements were provided for in the statute. Intimidation, combination, unfair management were not defined. There were no guidelines as to what the law enforcement people had to determine in order to prosecute criminally somebody under this statute. And I think, you know, the third aspect that was raised was the impingement on speech, and I believe that there is a very strong First Amendment issue here. I think speech is being impinged upon. You know, whether we like what he said or not, his right to speak his mind and to persuade others was being impinged upon by the statute. They had a burden themselves, the listener, the audience, of walking away, of determining for themselves the truth or falsity, of deciding how much credence they wanted to give to it. And I think that that burden has to be distributed as well to the listeners, more so than to the speaker. In terms of the harmless error, first of all, the ALSOP instruction, that's this circuit's instruction on intimidation, does require harm, and it does require a willful element. You say harm. You mean bodily harm? Bodily harm, yes. And I think I have that here. Well. Well, we'll find it. Yeah. It requires willfully putting one in fear of bodily harm arising from the willful conduct of the accused. So there's two willfuls there. And I would say that without that element, it's not harmless error because of the impingement on speech. I mean, I think in a First Amendment case, we've got to be really careful in calling something harmless where it's restricting our rights in a free society to say certain things under certain conditions if they're not going to produce harm, imminent harm. And in this case, the conduct and words of Mr. Cass will not rise to that level of unprotected speech. All right. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision. We'll take our morning recess at this time. All rise. This court stands at ease until 5 a.m. The court is adjourned. The case is submitted. The case is
judges: O'scannlain, Cowen, Bea